**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |
|---|---|
| BLANCA KLING, | * |
| Plaintiff, | * |
| v. | *      Case No. PWG-15-2866 |
| MONTGOMERY COUNTY, MARYLAND, | * |
| Defendant. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION AND ORDER

The Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), prohibits employers from paying an employee less than an employee of the other sex "for performing work substantially equal in skill, effort, and responsibility." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 948 (4th Cir. 1995) (quoting *Houck v. Va. Polytechnic Inst.,* 10 F.3d 204, 206 (4th Cir. 1993)). "The touchstone of the equal work analysis is whether the work is 'substantially equal.'" *Hassman v. Valley Motors, Inc.*, 790 F. Supp. 564, 567 (D. Md. 1992). Blanca Kling filed suit against her employer, Montgomery County (the "County"), claiming that it violated the EPA by paying her less than a male employee, Luis Martinez, earned for performing substantially equal work. Compl., ECF No. 1; Am. Compl., ECF No. 13. The County has moved for summary judgment, arguing that Mr. Martinez's work is not substantially equal. Def.'s Mot. & Mem. 2, ECF No. 44.[1]

---

[1] The parties fully briefed the Motion. ECF Nos. 44, 47, 52. A hearing is not necessary. *See* Loc. R. 105.6.

In her Opposition, Ms. Kling insists that she is comparing her current work to Mr. Martinez's work years earlier, when he was hired at a higher pay grade and already earned more than she does now but before his job evolved to the position he holds today.  Pl.'s Opp'n 1, 10–11, ECF No. 47.  An employee should be able to serve as the comparator based on his work and salary during an earlier time period, even when that employee was not the plaintiff's predecessor, provided that his work was substantially equal.  On the record before me, however, a reasonable factfinder could not find that the work Mr. Martinez actually performed previously, while earning a higher salary than Ms. Kling later earned, was substantially equal to the work Ms. Kling now performs.  Moreover, the County has identified undisputed evidence from which the only conclusion a rational jury could reach is that the County's reasoning for paying Mr. Martinez more for his work during the time period in question—not because of his sex, but because of his educational background, professional experience as a teacher and professor, and the nature of the tasks he was required to perform—indeed does explain why Ms. Kling was paid less. Accordingly, I will grant the County's Motion, enter judgment in the County's favor, and close this case.

## Background

Blanca Kling, a Montgomery County employee since 1980, began serving as the "Hispanic Liaison" for the Montgomery County Police Department ("Police Department") in August 2005.  Kling Answers to Interrogs., JE 136–37.  At the time, she had been working for the County as a Client Assistant Specialist (Grade 20); her official title remained the same, and she was not given a new job description for her new role. May 7, 2013 Reclassification Mem., JE 449; Pluchinski Dep. 33, JE 721; Kling Dep. 86–87, JE 45.  She describes the work she performs as Hispanic Liaison as follows:

| Blanca Kling's Responsibilities |
|---|
| Conducts effective outreach by employing a variety of means to achieve goal of getting message across to the Hispanic community. This includes:<br>  • disseminating information about police programs to the Hispanic community;<br>  • serving as the Police Department spokesperson to the Hispanic media outlets;<br>  • promoting Police Department enforcement campaigns to the media;<br>  • coordinating and planning press conferences;<br>  • arranging interviews between the Police Department and the media;<br>  • producing radio and television programs to bring information to the community about different Police Department services and other community issues;<br>  • representing the Police Department on committees and before the public;<br>  • attending meetings hosted by the school system, faith based organizations, and other groups to speak about issues like internet safety, using 9-1-1, and bullying; and<br>  • building trusting partnerships with the Hispanic community so information on crimes may be given anonymously or confidentially. |
| Ensures that the outreach strategies contribute to the Department's goals, and adapts these strategies to meet the new and changing needs of the Police Department. Coaches Police Officers to be interview in TV, print and radio stations |
| Promotes Police Department enforcement campaigns to the Hispanic media, and works with various County agencies to promote their different events and activities. Advertises and encourages participation in these events via radio, television, and print media. |
| Works with and assist officers in the Police Department, including the Chief, to arrange interviews with the Hispanic media, including to understand police roles and current information. |
| Ensures Police Department representation and active participation on well-established network and coalition groups to promote information sharing between the Police Department and the Hispanic community. This includes:<br>  • disseminating information about police programs that benefits the relationship between the Hispanic community and Police Department, such as the recruitment of police officers, the Police Ride-Along Program, and the Police Explorer Program;<br>  • working with department and agency representatives to plan programs, services, and events for the Hispanic community on behalf of the Department;<br>  • working with the Hispanic Liaison for the County Executive and the Office of the County Public Information Office to disseminate information about a new Violent Crime Law;<br>  • attending meetings hosted by the school system, faith based organizations, and the Literacy Council of Montgomery County, and many other groups to speak about issues like bullying, domestic violence, and gangs;<br>  • creating the monthly agenda for the Chief of Police for his Latino Liaison Committee; and<br>  • constantly communicating with leaders who attend the Latino Liaison |

> Creates, plans, and produces Hispanic educational radio and television program and public service announcements. Creates informational materials for print and broadcast media, departments, and agencies. Trains and coaches officers attending radio and TV interview.
>
> Utilizes bilingual and bicultural skills to assist in all aspects of linguistic and cultural competency initiatives undertaken by the Police Department. This includes:
> - assisting officers and detectives in their investigations because of the language barrier and difficulty obtaining cooperation from Hispanic victims;
> - assisting detectives with an investigation of an Immigration scam targeting undocumented, Hispanic victims, and a loan and mortgage scam involving 20 Hispanic victims;
> - responding to requests for information from all media sources;
> - coordinating publicity for Hispanic press conferences and special events; and
> - disseminating information to viewers via radio and television programs.
>
> Performs other assignments and duties as requested by the supervisor to meet the strategic goals and objectives of the Police Department. This includes:
> - encouraging transparency of the Department by arranging interviews for the Hispanic media with the Chief of Police, members of the Command Staff, and other officers;
> - providing assistance to victims of crime in the Hispanic community and referring them to appropriate resources;
> - organizing and coordinating press conferences to ask for the public's help in solving certain crimes; and
> - relaying information being discussed in the Hispanic community to the Chief and Department personnel that may hinder the Department's mission with the community; and
> - reaching out to the community to calm their fears regarding new laws, such as a Violent Crime Law and the "Secure Communities" program.

Kling Answers to Interrogs., JE 142–45. In 2010, she identified her "major duties" are as follows:

> 30% -- Communicate with Hispanic media sources . . . . Build trusting partnerships with the Hispanic community . . . .
>
> 25% -- Serve as media relations point of contact . . . . Maintain liaison and build relationships with department/agency management . . . . Work with department and agency representative to plan programs . . . . Represent the Police Department on committees and before the public.
>
> 25% -- Communicate verbally with media representatives, leaders in the Hispanic community, directors of community agencies, and the public on Hispanic issues related to the police Department. Respond to interview questions . . . . Appear on television and radio programs . . . .

> 10% -- Create, plan, and produce Hispanic educational radio and television programs, and public service announcements. Educate the Hispanic community through media sources . . . Coordinate publicity for Hispanic press conference and special events.

> 5% -- Respond to requests for information from all media . . . . Verify information and gather statistical information for community agencies as requested. Write articles for Hispanic newspapers . . . ; create informational materials for print and broadcast media, departments, and agencies.

> 5% -- Provide assistance to victims of crime . . . . Identify needs and ways to improve services for victims in Montgomery County. . . . [C]oordinate press conferences . . . .

May 7, 2013 Reclassification Mem., JE 450.

In June 2010, because her responsibilities had shifted significantly from when she was a Client Assistant Specialist, she requested a reclassification of her position. Beckley Aff., JE 577. She believed that she should be classified as a Public Information Officer II (Grade 25). June 3, 2013 Appeal Mem., JE 467. But, instead, in June, 2013 she was reclassified as a Program Specialist I (Grade 18). May 7, 2013 Reclassification Mem., JE 449; June 17, 2013 Final Reclassification Mem., JE 650. Ms. Kling's salary remained the same, which was above the maximum for a Grade 18 position, and she retained her "3% longevity award," which was applied to her base salary. June 17, 2013 Final Reclassification Mem., JE 651; Salary, JE 767. Her appeal of her reclassification to a lower grade was unsuccessful. June 3, 2013 Appeal Mem., JE 458; June 17, 2013 Final Reclassification Mem., JE 650–51.

In Ms. Kling's view, "[t]he position of Program Specialist I does not adequately cover [her] tasks and responsibilities," as her "work is more similar to the work performed by Luis Martinez in the County Department of Health and Human Services than the work performed by a Program Specialist I," and "Mr. Martinez is classified as Grade 25, and, like Ms. Kling, is the Hispanic liaison for his department." Am. Compl. ¶¶ 9, 11. She alleges that Mr. Martinez's "job description is very similar to Ms. Kling's position, and they both are the diversity outreach

coordinators for their respective agencies," and therefore "both should be the same grade classification and similarly compensated." *Id.* ¶ 46. She claims that her "responsibilities meet or exceed those of Mr. Martinez." *Id.* ¶ 47; *see also id.* ¶¶ 48–55.

Ms. Kling sued the County, claiming that it violated the EPA and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2 ("Title VII") by "pa[ying] wages to Plaintiff different than a male in a similar position" when both she and Mr. Martinez "have similar classifications, functions, titles and duties" and "hold jobs that require equal skill, effort, and responsibility" and "are performed under similar working conditions." Am. Compl. ¶¶ 62–65, 70–75. The County moved to dismiss Ms. Kling's claims, and I granted the motion as to the Title VII claim, but denied it as to the EPA claim. *Kling v. Montgomery Cty.*, No. PWG-15-2866, 2016 WL 3940237, at *6–8 (D. Md. July 20, 2016).

The County now moves for summary judgment on Ms. Kling's remaining EPA claim. Because a reasonable factfinder could not find on the record before me that the work Mr. Martinez actually performed during the time period at issue was substantially equal to the work Ms. Kling now performs, Ms. Kling cannot establish a *prima facie* case. Further, given that the only reasonable conclusion that a rational jury could reach regarding the County's reasoning for paying Mr. Martinez more for his work during the time period in question is that it was not because of his sex, but because of his educational background, professional experience as a teacher and professor, and the skills required for his job, the County has met its burden of proving an affirmative defense to Ms. Kling's action. Therefore, I will grant the County's Motion.

## Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c)(1)(A); *see Matherly v. Andrews*, 859 F.3d 264, 279, 280 (4th Cir. 2017).  If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986).  The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment.  *Id.*

## Discussion

The Equal Pay Act (EPA"), 29 U.S.C. § 206(d), is a part of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* "The EPA prohibits gender-based discrimination by employers resulting in unequal pay for equal work."  *U.S. Equal Employment Opportunity Comm'n v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018) (citing 29 U.S.C. § 206(d)(1); *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)) (footnote omitted).  To prevail on her Equal Pay Act claim, Ms. Kling must establish that "she (1) receives lower pay than a male co-employee (2) for performing work substantially equal in skill, effort, and responsibility [3] under similar working conditions. The comparison must be made 'factor by factor with the male

comparator.'" *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 948 (4th Cir. 1995) (quoting *Houck v. Va. Polytechnic Inst.,* 10 F.3d 204, 206 (4th Cir. 1993)).

As noted, "[t]he touchstone of the equal work analysis is whether the work is 'substantially equal.'" *Hassman v. Valley Motors, Inc.*, 790 F. Supp. 564, 567 (D. Md. 1992); *see also Alexander v. Marriott Int'l, Inc.*, No. RWT-09-2402, 2011 WL 1231029, at *4 (D. Md. Mar. 29, 2011); *Reece v. Martin Marietta Techs., Inc.*, 914 F. Supp. 1236, 1241 (D. Md. 1995). The Court considers whether the two positions "have a 'common core' of tasks," that is, whether "significant portions of the two jobs are identical," and, if so, "the inquiry turns on whether the differing or additional tasks require greater skill or responsibility. Skill is a function of experience, training, education, and ability, and is measured in terms of the 'performance requirements' of the job. Responsibility measures, among other things, the degree of 'accountability' to higher-ups." *Hassman*, 790 F. Supp. at 567–68.

If Ms. Kling establishes a *prima facie* case,

> the burdens of production *and* persuasion shift to the defendant-employer to show that the wage differential was justified by one of four affirmative defenses listed in the statute . . . : (1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; or (4) a disparity based on any factor other than gender.

*Md. Ins. Admin.*, 879 F.3d at 120 (citing 29 U.S.C. § 206(d)(1); *Corning Glass*, 417 U.S. at 195; *Brinkley–Obu v. Hughes Training, Inc.*, 36 F.3d 336, 344 (4th Cir. 1994)). "[T]he burden on the employer necessarily is a heavy one," as it must "submit evidence from which a reasonable factfinder could conclude not simply that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity." *Id.* at 120–21. This means that if the plaintiff establishes a *prima facie* case, "the employer will not prevail at the summary judgment stage unless the employer proves its affirmative defense so convincingly that a rational jury could not have reached a contrary conclusion." *Id.* at 121.

**Ms. Kling's and Mr. Martinez's Current Responsibilities and Required Skills**

The County challenges whether Ms. Kling can demonstrate that she "perform[ed] work involving similar skill, effort and responsibility as Mr. Martinez" to establish the second element of her *prima facie* case. Def.'s Mot. & Mem. 14; *see Strag*, 55 F.3d at 948. As the County sees it, "the undisputed facts establish that Plaintiff is not responsible for the bulk of tasks that Mr. Martinez is, nor does Plaintiff even possess the skills to do so." Def.'s Mot. & Mem. 17. It is undisputed that Mr. Martinez monitors contracts, coordinates and provides limited English proficient ("LEP") training, and coordinates and provides translation and interpretation services, dedicating 20% of his time at work to each of these three tasks. Martinez Dep. 56–57, JE 267–68. He also provides "reports or statistics" about interpretations and translations, as well as analyzes the data, as needed. Martinez Dep. 152–53, JE 291–92. The County contends that Mr. Martinez is responsible for approximately fifty "tasks and duties" for which Ms. Kling is not responsible, insisting that she conceded as much in her deposition. Def.'s Mot. & Mem. 19 (citing Kling Dep. 149-65); *see also* Def.'s Reply 10 (noting that Plaintiff did not respond to this argument).

It is true that, when asked during her deposition if she did "contract monitoring," Ms. Kling asked what "contract monitoring" meant, and in response, counsel asked if she "generate[d]" or "process[ed] documents related to contract monitoring," "generate[d]" or "process[ed] contract action worksheets," "generate[d]" or "process[ed] budget modifications," "generate[d]" or "process[ed] paperwork related to site visits related to contracts," and more than two dozen similar questions regarding aspects of contract monitoring. Kling Dep. 150-55, JE 61-62. Ms. Kling answered "no" to each question and stated that she "do[es]n't do anything with

contracts," and that her "job is not related to that." *Id.* Thus, it is undisputed that Ms. Kling does not monitor contracts. *See id.*

Counsel then asked if she "coordinate[d] reporting out-of-language services" or "report[ed] on the number of language services that a department uses," and Ms. Kling said "no." Kling Dep. 155, JE 62. Therefore, it also is undisputed that she does not provide statistics on translations and interpretations. *See id.*

And, counsel asked questions about Ms. Kling's role in training, specifically whether she was "a professional trainer," "conduct[ed] bi-weekly limited English proficiency language training during new employee training sessions," "assist[ed] in advising LEP training," "conduct[ed] yearly full-length LEP trainings for staff," knew "the laws and regulations behind providing LEP training," or "contribute[d] to the drafting of annual reports as it relates to LEP," and Ms. Kling again answered in the negative. *Id.* Thus, no dispute exists that Ms. Kling is not involved in LEP training.

Counsel also asked if Ms. Kling "coordinate[d] sending translations out to contractors" or "look[ed] over translations once they are received back from contractors," and Ms. Kling said "no." Kling Dep. 155-56, JE 62. Additionally, she testified that she was not "allowed to translate written documents on behalf of the Montgomery County Police Department." Kling Dep. 159, JE 63. Ms. Kling also testified that she did not "keep statistics" or "collect any sort of data usage." Kling Dep. 156–57, JE 62–63. Yet, she did testify that she "assist[s] detectives with criminal investigations . . . [b]y, of course, translating," and that she translated articles into English so that "Chief Manger [could] have a translation and present it to the leaders of the Latino Liaison Committee because not all of them speak English." Kling Dep. (June 22, 2017) 142, 199, JE 59, 73. And, in her Performance Planning and Evaluation Form for the period

February 1, 2011 – February 1, 2012, one listed expectation was that she "[d]etermine what is newsworthy to the Latino Community and obtain[] sufficient information to provide a release *or translate a release into Spanish*." JE 359. Also, in a letter dated May 22, 2013, Jeff Dunckel, Pedestrian Safety Coordinator of the Office of the Director of Montgomery County Department of Transportation, wrote that "Ms. Kling helped [the Pedestrian Safety Initiative] conduct training programs for . . . volunteers, providing critical language and translation support." JE 367. Thus, it appears that Ms. Kling provided translations, as did Mr. Martinez, albeit in a different capacity.

Consequently, no genuine dispute exists that Ms. Kling does not perform the contract monitoring and LEP training tasks that comprise 40% of Mr. Martinez's time and, while she provides translations, the scope of her translation work is different from Mr. Martinez's. Therefore, Ms. Kling cannot establish a *prima facie* case under the EPA based on her Mr. Martinez's current positions, given that more than 40% of their work is not substantially equal. *See Galarraga v. Marriott Employees Fed. Credit Union*, No. JFM-94-1986, 1996 WL 376408, at *3 (D. Md. Apr. 24, 1996) (noting that, for jobs to be "substantially equal," they "should be 'virtually identical'" because "'[w]hen Congress enacted the Equal Pay Act, it substituted the word "equal" for "comparable" to show that "the jobs involved should be virtually identical, that is, they would be very much alike or closely related to each other"'") (quoting *Jacobs v. Coll. of William & Mary*, 517 F. Supp. 791, 798 (E.D. Va. 1980) (citations omitted), *aff'd*, 661 F.2d 922 (4th Cir. 1981)). Indeed, Ms. Kling appears to concede this point by focusing on Mr. Martinez's position at a time when, according to Ms. Kling, he also did not perform contract monitoring or provide LEP training. *See* Pl.'s Opp'n 1, 10–11.

**Comparison to Mr. Martinez's Position at an Earlier Time Period**

In her Opposition (albeit not in her Complaint or Amended Complaint), Ms. Kling asserts that she is not comparing her current position to Mr. Martinez's *current* position (which encompasses these tasks), but rather she is comparing *her current* position to his "position from the *2004-2008 time period*" (which, she insists, did not encompass these tasks). Pl.'s Opp'n 18; *see also id.* at 3 (listing and describing Ms. Kling's current duties); *id.* at 21 (referring to "the critical time period of 2004-2008").

*Statute of Limitations*

Insofar as the County contends in its Reply that Ms. Kling's reliance on Mr. Martinez's 2004–2008 job responsibilities and salary raises a statute of limitations issue, *see* Def.'s Reply 4–8, its argument is unavailing. It is true that a plaintiff is time-barred from recovering from even willful violations of the EPA that precede his or her lawsuit by more than three years. 29 U.S.C. § 255(a) (two year statute of limitations for FLSA violations and three year statute of limitations for willful violations of the FLSA); *see Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 345–46 & n.20 (4th Cir. 1994). But, Ms. Kling is not trying to recover for an alleged failure to pay her equally in 2004–2008. Rather, she asserts that she can prove her timely claims based on a comparison with Mr. Martinez's pay at an earlier time. Pl.'s Opp'n 18.

In *Brinkley-Obu*, the Fourth Circuit observed:

> It is immaterial that a member of the higher paid sex ceased to be employed prior to the period covered by the applicable statute of limitations period for filing a timely suit under the EPA. The employer's continued failure to pay the member of the lower paid sex the wage rate paid to the higher paid predecessor *constitutes a prima facie continuing violation.* Also, it is no defense that the unequal payments began prior to the statutory period.

36 F.3d at 346 (quoting 29 C.F.R. § 1620.13(b)(5) (emphasis added in *Brinkley-Obu*)). Consequently, "to demonstrate that a violation has occurred, a plaintiff may offer predecessors

and successors, both immediate and, in appropriate circumstances, non-immediate, as well as co-workers, for purposes of comparison." *Brinkley-Obu*, 36 F.3d at 349.

Defendant tries to distinguish *Brinkley-Obu* on the basis that Mr. Martinez was neither a predecessor nor a successor. Def.'s Reply 5. But in *Brinkley-Obu*, the Fourth Circuit also observed that "'evidence of present discriminatory activity' includes the continued payment of a lesser wage to a member of one sex than to a member of the other sex who *has done* or is doing substantially similar work," without stating that the "member of the other sex" had to be a predecessor. 36 F.3d at 351 (emphasis added; emphasis from *Brinkley-Obu* removed); *see also Bartelt v. Berlitz Sch. of Languages of Am., Inc.*, 698 F.2d 1003, 1005 n.1 (9th Cir. 1983) ("[U]nder the Equal Pay Act plaintiffs need not rely solely on a discriminatory wage differential between current employees to establish a violation, but may make comparisons to *prior employees*." (emphasis added; emphasis in *Bartlet* removed)); *Cty. of Washington v. Gunther,* 452 U.S. 161, 201 (1981) ("Under the Equal Pay Act, it is not necessary that every Equal Pay Act violation be established through proof that *members of the opposite sex* are currently performing equal work for greater pay." (emphasis added; emphasis in *Gunther* removed) (Rehnquist, J. dissenting)). Congress intended the EPA "to remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry" by "requir[ing] that 'equal work will be rewarded by equal wages.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting S. Rep. No. 176, 88th Cong., 1st Sess., 1 (1963)). It is consistent with that purpose to consider the wages that a comparator previously received for substantially similar work; the Court should not have to disregard a gender-based discrepancy in salaries simply because the higher paid position has evolved or no longer exists. If, as Ms. Kling contends, Mr. Martinez "has done . . . substantially similar work" to the work she currently performs and for

which she continues to receive a lower salary than he received, then he is an appropriate comparator. *See Brinkley-Obu*, 36 F.3d at 351; *see also Gunther,* 452 U.S. at 201; *Corning Glass*, 417 U.S. at 195; *Bartelt*, 698 F.2d at 1005.

*Salaries*

The evidence before me includes Ms. Kling's annual salaries beginning in 2010 and shows that Mr. Martinez earned $80,356.00 as of July 9, 2006; $87,362.00 as of July 8, 2007; and $93,944.00 as of July 6, 2008. Personnel Action Forms, JE 764-66; Salary, JE 767. It also shows that Mr. Martinez was hired as a Grade 25 in 2004. Lam Dep. 13–15, JE 5. Mr. Martinez's supervisor testified that "the Human Resources guidance is . . . to offer a new hire no more than midrange," and she "offered within that range," but she did not remember the salary she suggested. *Id.* Ms. Kling alleges that the midrange for a Grade 25 is $80,261, Am. Compl. ¶ 13, but that reflects the Montgomery County Government General Salary Schedule from 2015, *see* https://www.montgomerycountymd.gov/HR/compensation/Compensation.html (salary schedules from FY 2015–FY 2019); Fed. R. Evid. 201(b)(2) (court may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Montgomery County's Designated Representative Karen Pluchinski testified that she did not review "any salary history for Mr. Martinez prior to 2009." Pluchinski Dep. 38, JE 722. She explained that prior to 2009, pay records were kept on a different system and are now only kept on microfiche, such that they cannot be reviewed "without a lot of difficulty." *Id*. at 13–15, JE 716. Thus, there is no evidence of Mr. Martinez's salary prior to July 9, 2006.

Because Ms. Kling has not established what Mr. Martinez's salary was prior to July 9, 2006, to prove that after September 22, 2012 or September 22, 2013, she received less pay than

he did at that earlier time, she cannot prevail on her EPA claim based on the work he performed prior to that date. *See Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 948 (4th Cir. 1995). But, given that the differing nature of Mr. Martinez's work began when he first was hired, and his earlier work set the stage for his work in mid-2006 and later, I will discuss the entire 2004–2008 period that Ms. Kling identified.

I note that Ms. Kling earned a base salary of $74,181.00 as of December 17, 2010; $76,591.88 as of September 8, 2013; $79,081.00 as of September 7, 2014; $80,663.00 as of July 15, 2015; $81,066.00 as of July 10, 2016; and $81,471.00 as of January 8, 2017. Salary, JE 767. Because she was approved for a 3% increase for longevity, her "Total County Salary" was $76,406.43 as of December 17, 2010; $78,889.64 as of September 8, 2013; $81,453.43 as of September 7, 2014; $83,082.89 as of July 15, 2015; $83,497.98 as of July 10, 2016; and $83,915.13 as of January 8, 2017. *See id.*; *see also* June 17, 2013 Mem., JE 651 (noting that Ms. Kling "has already been granted her 3% longevity award").

*Mr. Martinez's Earlier Work*

It is true that Mr. Martinez "was hired to do outreach," Lam Dep. 19, JE 6, which is a primary focus of Ms. Kling's position, Kling Answers to Interrogs., JE 142–45; Pl.'s Opp'n 19. And, as noted, both Ms. Kling's and Mr. Martinez's positions encompass translations in some capacity. Also, it is undisputed that Mr. Martinez did not begin contract monitoring until 2008. Martinez Dep. 206, JE 305.[2] Yet, given the scope and extent of Mr. Martinez's role in developing and providing LEP training, and the skills required for that aspect of his position, a rational factfinder can reach only one conclusion about Mr. Martinez's work, even considering

---

[2] Given that Mr. Martinez began contract monitoring in 2008, his salary as of July 6, 2008 also is not appropriate for comparison.

his work prior to 2009: His responsibilities and required skills were not substantially similar to Ms. Kling's.

Although Mr. Martinez was not hired to develop or provide LEP training, he devoted considerable time to this aspect of his position beginning when he first was hired. Lam Dep. 19, JE 6. His supervisor, Betty Lam, testified:

> I joined the County in July of 2004. I hired him in November of 2004.
>
> Our primary goal at that time was language access. So *although he was hired to do outreach* and he's doing outreach for all racial, eth[n]ic, minority, community and underserved community in the county, his primary—*his primary work is to help me in establishing language access services* in the department so that we are in compliance with Federal regulation on limited English proficiency.
>
> So we have to develop a policy and a plan for the department. We have to do a lot of research and—best practice research and literature search to understand what other jurisdictions are doing so that we have a plan that we can develop for our department.
>
> Then we have to present the plan to the senior leadership, get buy-in, get resources allocated, implement a plan so that the entire department knows what the plan and the policies and the procedures are, and then roll out training.
>
> So very soon after he was hired, from 2005 to 2007, the intense work is around language access. And—as well as his—his other job, which was outreach and education.
>
> It started to change around 2008 because I have—I have been given more responsibility, so naturally, he would be given more responsibility.

Lam Dep. 19–20, JE 6. And, while Mr. Martinez characterized his initial responsibilities as "maybe 50 percent working on outreach and another 50 percent doing miscellaneous and other administrative things," Martinez Dep. 31, JE 261, he also testified that "one of the first requirements of [his] job" was attending an LEP training that the State of Maryland's Department of Health and Mental Hygiene offered, *id.* at 129, JE 286.

> [He] came to work for the Department of Health and Human Services as the outreach coordinator in November of 2004 and in December of 2004, one month later, [he] was sent by [his] supervisors to receive the LEP training that was provided by the state so [he] was familiar with LEP issues and all that that [he] was not familiar with previously.

*Id.* at 129, JE 286. After he received that training, "it was Betty Lam and [Mr. Martinez] who helped devise [their department's LEP training] with the assistance of a professional trainer in 2005." *Id.* at 101, JE 279.

Significantly, "[j]ob descriptions and titles . . . are not decisive. Actual job requirements and performance are controlling." *Brennan v. Prince William Hosp. Corp.*, 503 F.2d 282, 288 (4th Cir. 1974) (citing 29 C.F.R. § 800.121 (1973)). Thus, "actual performance, not official job descriptions, control[s] the determination of whether a higher degree of responsibility and supervisory authority actually existed." *Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 858 (D. Md. 2000) (noting that in *Katz v. School Dist.,* 557 F.2d 153 (8th Cir. 1977), the Eight Circuit found an "EPA violation even though a female employee's responsibilities were only equal to those of her male comparator because she performed work above and beyond her job description"); *see also Usery v. Bd. of Ed. of Baltimore Cty.*, 462 F. Supp. 535, 559 (D. Md. 1978) ("[J]ob requirements and performances, in actual fact, are controlling, not the mere words of job d[e]scriptions."). Thus, while Mr. Martinez's job description focused on outreach, it is his actual work—which included "establishing language access services," that is, "develop[ing] a policy and a plan for the department" by "do[ing] a lot of . . . best practice research and literature search to understand what other jurisdictions are doing" and "present[ing] the plan to the senior leadership, get[ting] buy-in, get[ting] resources allocated, [and] implement[ing] [the] plan," and, ultimately, "roll[ing] out training"—that the Court considers to determine what skills and responsibilities his position involved. *See Brennan*, 503 F.2d at 288; *Glunt*, 123 F. Supp. 2d at 858.

As for his role in providing LEP training, Mr. Martinez testified that "LEP training started in 2006," at which time "it might have been like maybe 15 percent" of his job responsibilities. Martinez Dep. 58, JE 268. He recalled:

> [T]he LEP implementation plan was written in 2004 and it was adopted by the senior leadership team in February of 2005 and because the plan required training to all of our employees, all of the employees were trained in June of 2005, and I'm talking about all of the 1600 employees.
>
> After that, the next year when we started needing to provide LEP training, I think that it was Betty Lam and myself who are providing the training, and that was in the year 2006, maybe '07. I would think that by the year 2008 I was already starting to take some responsibilities for LEP training . . . .

Martinez Dep. 203–04, JE 304. He noted that initially he was providing training "on the wing of [his] supervisor," and in fiscal year 2009 or 2010 he "was given a little bit more of the responsibility to do that kind of by [him]self." *Id.* at 204, JE 304.

### The Comparison

The undisputed evidence demonstrates that Ms. Kling's current position and Mr. Martinez's position prior to 2008 share a "'common core' of tasks," as the main differentiating factor—Mr. Martinez's role in LEP training—consumed only approximately 15% of his time. *Hassman*, 790 F. Supp. at 567. Therefore, I will consider "whether the differing or additional tasks require greater skill or responsibility." *Id.*

As noted, "[s]kill is a function of experience, training, education, and ability, and is measured in terms of the 'performance requirements' of the job." *Hassman*, 790 F. Supp. at 567–68. Mr. Martinez's initial, additional tasks involved "a lot of research" to ensure "compliance with Federal regulation on limited English proficiency." Lam Dep. 19–20, JE 6. Conducting such research certainly requires experience and training or education. His three bachelor's degrees (in elementary education, high school education, and philosophy) as well as his master's degree (in gerontology), Martinez Resume, JE 252, would have helped him meet these

performance requirements. *See Hassman*, 790 F. Supp. at 567–68. Likewise, his "[a]dministrative experience to include planning programs, coordination, supervision"; his "Program Planning and Development for Educational Purposes"; his "Development of Curriculum appropriate to different age levels" and his "Planning and Coordinating Conferences and Workshops" also would have contributed to his skills and ability to perform the assigned work. Martinez Resume, JE 251. And, when his additional tasks evolved to include providing the actual LEP training, another performance requirement that necessitates training and experience, the training he received in December 2004, as well as his experience as a teacher of English, Spanish, philosophy from 1974 to 1990, and in elementary school from 1972 to 1973, would have helped him serve as a trainer. *Id.*, JE 250–51. In contrast, Ms. Kling "obtained an AA in Mental Health from Montgomery College" and "attended numerous . . . trainings and courses provided by Montgomery County," but did not identify any training or experience that she had in conducting research, developing educational programs, or teaching. *See* Kling Answers to Interrogs., JE 137–38. Thus, Mr. Martinez's position required skills that Mr. Martinez had and Ms. Kling did not. The additional, LEP training-related tasks also required a significant "degree of 'accountability' to higher-ups." *Hassman*, 790 F. Supp. at 568. Mr. Martinez was helping "to develop a policy and a plan for the department," a program that the department depended on to be "in compliance with Federal regulation on limited English proficiency." Lam Dep. 19–20, JE 6. Certainly, Ms. Kling is responsible for "creat[ing], plan[ning], and produc[ing] Hispanic educational radio and television program and public service announcements related to Montgomery County and the Montgomery County Police," and she "creates informational materials for print and broadcast media, departments, and agencies . . . trains and coaches officers attending radio and TV interviews," and "is an executive producer

[and] anchors and invites guests for the television program, 'Dialogando con La Policia del Condado de Montgomery' (A Dialogue with Montgomery County Police)." Kling Answers to Interrogs., JE 140–41. But, she has not identified any training, education or experience that helped her meet these performance requirements. And, in terms of accountability, Ms. Kling testified that she does not draft press releases and she has "specific instructions as far as how much [she] can say to the media," so as "not [to] jeopardize the [police] investigation." Kling Dep. 97–98, JE 48. Further, to "know how to respond to interview questions," she relies on press releases and also "speak[s] with Captain Starks or with Sergeant Innocenti." *Id.* Thus, as the terms are defined for EPA purposes, Mr. Martinez's additional tasks involve more skill and a greater degree of responsibility than Ms. Kling's. *Hassman*, 790 F. Supp. at 567–68. Therefore, the work Ms. Kling performs and the work Mr. Martinez performed before 2008 is not substantially equal. *See id.* Consequently, Ms. Kling cannot establish a *prima facie* case of an EPA violation. *See Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 948 (4th Cir. 1995); *Houck v. Va. Polytechnic Inst.,* 10 F.3d 204, 206 (4th Cir. 1993).

Moreover, these same facts show that "the wage differential was justified by . . . a disparity based on a[] factor other than gender," *Md. Ins. Admin.*, 879 F.3d at 120, namely the tasks assigned to Mr. Martinez and the education and experience required for him to complete those tasks. The County has proved this affirmative defense "so convincingly that a rational jury could not have reached a contrary conclusion." *Id.* at 121. Thus, Ms. Kling could not prevail even if she had established a *prima facie* case. *See id.* The County is entitled to summary judgment on Ms. Kling's EPA claim. *See id.*

**<u>ORDER</u>**

Accordingly, it is, this  22nd  day of <u>June</u>, <u>2018</u>, hereby ORDERED that

1.  The County's Motion, ECF No. 44, IS GRANTED;

2.  Judgment IS ENTERED in the County's favor; and

3.  The Clerk SHALL CLOSE this case.

_____/S/_____

Paul W. Grimm
United States District Judge
